Good afternoon. May it please the court, my name is Wanda Day and I represent Carmen Heredia. I would like to reserve two minutes at the end of my argument. You know, look at the clock. You have whatever is left over when you sit down. All right. Thank you. First of all, I think we start with the premise that the dual deliberate ignorance instruction is rarely appropriate. The cases have set forth three requirements. We know Justice Kennedy doesn't like it. There we go. First case I worked on when I clerked for him. Is that right? Yeah. Well, then I guess I'm standing in a good place, Your Honor. Well, that doesn't mean I agree with him. Well, I'm hoping that you do. But I, perhaps more than my colleagues, am aware of the controversial nature of the dual instruction. Well, I think this is one of those cases where it certainly was not appropriate. I think that in order for the government to even get this instruction, there has to be specific evidence presented that basically three things occurred. And the first is that the defendant actually suspected that she might be involved in criminal activity. Didn't she say something to that effect? Oh, she did. Definitely. But what she did say was that she suspected that there might be marijuana in the car, not that she suspected that she herself was involved in it. And what's very significant about what she said is the timing of when she said it. And that's important because... Well, but that's a fine distinction, saying it's in the car, but I didn't suspect I was involved. That turns on her understanding of how the law works. Well, I... You know, I mean, let's say somebody, she had suspected that in the back of the car was, you know, something that was dangerous, that, you know, might be dangerous to drive with, let's say, a can of gasoline or, you know, a butane tank that's leaking or something. What she would have done is gone there to investigate. She would have looked to make sure that the car was safe to drive. It sounds to me like when she says, look, I suspected there was marijuana there, but I shouldn't go look. That sounds pretty supportive of a general instruction. Well, I think this is very... It's very important here to look at the facts because she was driving along an interstate. And we presume, I guess we could, that there were people driving along the interstate at whatever speeds they drive there, 50, 60, 70 miles an hour, and it would have been dangerous for her to pull over. She had two children in the car. She had her aunt and her mother in the car. In addition, by the time her suspicions arose to the level that she was really concerned about this, she had already passed the last exit before the checkpoint. I want to make sure I'm very clear on this. Earlier, when she had been at the funeral, that was Nogales, Mexico. When she went with her mother down to go to the dentist, that was Nogales, Arizona. So we were on the American side of the border. Am I correct on that? That's correct. Okay. When she leaves Nogales, Arizona, to drive to Tucson, she gets stopped at the border stop that's inside between Nogales, Arizona, and Tucson. Is that correct? It's actually not a border stop. It's like an inspection stop. Okay, like an agricultural inspection station or something? Right. So it's not really the border. How far from Nogales is that? How far has she driven on the interstate before she got to that stop? You know, I'm not sure exactly. I don't think that's in the record. This may not be in the record, and you may or may not know the answer. Sometimes there are these sort of border checkpoints that are actually some distance removed from the border to try to pick up people who might have walked across the border or gotten a van or whatever. Some of those checkpoints are permanent, and some of them are established just because we're going to do it here today. Was this checkpoint permanent? This checkpoint, according to the information that I had, was permanent or semi-permanent. Was it always, if I can use the word, manned? I wouldn't say that it was always manned, and I'm not sure this is on the record. I mean, I have some familiarity, but you obviously don't want to know what I know. But my understanding from the record is that it was like semi-permanent, not always manned, but frequently manned. Okay. She tells us about Temecula. Excuse me? I'm sorry. Where are you from? I'm from Tucson. Okay. I'm sorry. In California, we have a checkpoint at Temecula, and sometimes it's manned, sometimes it's not. Basically, the way this was set up was you take an off-ramp off the interstate, and everyone goes through that checkpoint station. She becomes suspicious at some point. She testifies it's because her mother and aunt are behaving a little strangely. Her mother is smoking. Her aunt is drinking. She tells the officer later on that she suspected that they were up to something, and then she uses the word marijuana, or does the officer suggest the word marijuana to her? I believe the officer suggested that because he actually told her there was marijuana in the trunk, because she denied that she ever knew that. Okay. Is there anything in the record that would suggest why she might have thought there was marijuana in the car? The only thing that would lead to that would be the fact that she kind of suspected that her mother and aunt were involved in something illegal, and marijuana is what people do down there that's illegal. Were the mother and aunt charged in this case? They were not. They were not charged. Nobody else was charged. She was the only one charged. Okay. And also that the mother and aunt. Do they have prior drug-carrying charges? Not that I'm aware of. But the other thing that she thought was very suspicious was that her mother didn't work and her mother testified to this, and yet she had a lot of money. And Ms. Heredia did not like having her mother around her children because of her mother and the mother's boyfriend's drinking and drug use. So she didn't associate with them. The district judge seemed to place a lot of emphasis on the idea that Carmen had been in Nogales, Mexico, earlier for a funeral. She had taken a shuttle early in the morning from Nogales up to Tucson. She got her oldest daughter off to school. She had the kids who were sick, and she doesn't have a good relationship with her mother. And yet when her mother calls and says, let's take a shuttle and go back to Nogales, I've got to go to the dentist, she picks up and goes back at the drop of a hat. Well, I think that basically what happened is, you know, they didn't have a good relationship, but they had some kind of a relationship. And her mother called up and said, I need to go to the dentist. Will you go with me? The evidence, the testimony of the aunt and the mother and the aunt that lent the car was, you know, it was all over the place. So, but basically what we need to look at in this case is, did she deliberately avoid taking steps to find out? Because that's the second prong of the test. Did she deliberately avoid taking steps to find out whether there was marijuana in here? And that's why the timing is important. What could she have done? She could have asked her mother. Well, there was no testimony whether there was any marijuana in the back. Is there some reason you're nervous? Yeah, there was no testimony. What's going on here? Excuse me. I'm sorry. Yeah, there was no testimony either way on that. But the test is that the government has to present the specific evidence showing that she deliberately avoided something. And by the time her thought process got to the point of really realizing that something was suspicious, it was too late for her to do anything. All the marijuana smell, right? Well, I guess there was a lot of perfume smell in there and, you know. So my argument then would be that the government didn't prove that she deliberately avoided anything, that she made a calculated effort or a conscious decision to not find out anything because There's a trick buried in here, and I'm not sure quite what to do with it. You said the government didn't prove that she consciously avoided it. But I'm not sure the government has to prove it in order to get the instruction. I think the government has to present evidence that she deliberately avoided. I think that is correct. And why isn't there enough evidence here to show that she deliberately avoided? Well, because by the time it came into her consciousness, and this is in the record, that there might be something to be suspicious of, she had already gone past the last exit and she was at the checkpoint. That sounds to me like an explanation. She makes a statement, says, yes, I was suspicious, and then she has an explanation as to when it happened. What exactly was the evidence on the point of when did she realize? The evidence is on page 69 and 70 of appellant's excerpts of record. Is this tab 7? Excuse me? Tab 7. Your excerpts of record are in tab 7. Yes, tab 7. And did you say page what? Page 69, the Bates stamp there. Oh, Bates tab 69. Oh, got it. And this is when she's being questioned by her attorney. It starts on the bottom of page 69 and goes over to the next page. Well, but you see what I'm saying? This is her testimony at trial. She makes a statement to the police when she's questioned, and that's evidence that she sort of suspected something was going on, and that she didn't check up on it. Now she gets to trial, and she explains, oh, well, this didn't dawn on me until I was passed the last text. But she actually told the officer that as well. She did? Yes, she did. Where's that? That she had thought about turning around, but let's see if I can find that for you. That she had thought about turning around, but it was too late that she had reached the exit. That's page 70. Well, that's your testimony, but you're saying that she said this earlier to the officer? I mean, you see what I'm saying? She says this to the officer, and that could be believed, but the jury doesn't need to believe her when she says, oh, but it didn't come to this realization until it was too late. I mean, they could disbelieve that part of the story. Well, I think it's very significant in this case because the government's theory of the case was the deliberate ignorance theory. Well, they tried it both ways, didn't they? Well, they did try it both ways, but they conceded in their. . . Did the government have a theory as to who was behind this? If she was an inadvertent participant, who was behind this? Who put the marijuana in the car? They didn't. There was some testimony about when she picked up the car that the trunk was empty, and then later, obviously, the marijuana was in it, but they didn't really have a different theory. But their argument and in their. . . It's just one of these things that always happens to people. You know, they pick up an empty car in Mexico, and lo and behold, they come over here, somebody has miraculously put marijuana in the trunk or in the wheel or in the wheel well or something. Well, I think in this situation, though, it's possible, it's highly possible that this woman was actually innocent, and but for the giving of this instruction. . . Obviously, it's possible, but you had a trial with a jury, and she told her story, and, I mean, you're really hanging your appeal on the propriety of the instruction. Could the jury, was the jury entitled to find that she was deliberately indifferent? And I'm sorry, that she deliberately avoided looking. And for reasons Judge Kennedy has said in his dissent in Juneau, I think this is a highly problematic legal doctrine, but it is our law. It's been our law for almost 30 years now, and. . . But it's only our law as applied to the correct facts situation. And when you look at the other cases, there was something fishy going on, you know, something criminal. In other words, in a lot of the cases, somebody was given money to take a car across the border, and then they purposely didn't look to check to see what. . . Well, the primary distinction between the cases that are sort of accepted applications of this is all the reasons for suspicion are present at the time the car is picked up. This car, this was different because the reasons for suspicion, according to her testimony, and there doesn't seem to be much contrary testimony, developed during the course of the car ride. And that's why I think the timing is crucial, because what did she have time to do? Really nothing, because she was, became suspicious over. . . Of course, that's according to her testimony. Maybe the jury thinks, well, she says it developed during the course of the car ride. The truth is she knew all along. But it's important, and if you look at my excerpts of record, the government's response to defendant's motion for a new trial, excerpt 7, page. . . Page 16. Okay. I'm sorry. I want to read along with you. So what tab are you on? Okay. I'm on tab 7 still. Tab 7. Okay. I'm with you. And I'm on page 16, Bates page 16 at the bottom. Bates tab 16. Hang on. I'll get there. I'll get there. Okay. I'm now on page 16. Okay. There's letter B. Letter B. And this is the government's response. Okay. Correct. And that's important, because under letter B, the paragraph reads, the facts and circumstances surrounding the illegal activity in the present case are in the jewel rather than the Sanchez-Robles mold. This is the important sentence. The evidence points to deliberate ignorance, not to actual knowledge of illegality. And that was the principal argument that the government made at trial at their closing. I see. That is to say, and the deliberate ignorance doesn't really start to show up until she's in the car, and while she might have had a suspicion at the beginning because she knows her mom has the spending money that's unaccounted for and her mom's kind of a screwy figure here, this doesn't really come in on her, even according to the government's view of the evidence, until she's been driving for a little while. That's correct. Okay. Thank you. Well, the government counsel, I think that's your argument, but I'm not sure government counsel would agree with your characterization of what their argument is. But why don't we hear from the government? Okay. We've taken quite a bit of your time. We'll give you a couple of minutes for a bottle if you want to take it. Thank you. May it please the Court, my name is Nathan Leonardo, and I'm representing the government in this case. The government does disagree with that characterization. There is evidence on the record, and the district court noted this in its findings, that the defendant actually knew about the marijuana or was deliberately ignorant from the time that she left her aunt's house. Wait, those are quite different. They require different instructions, and our cases, our jewel cases, say that you've got to fish or cut bait. You've got to tell us one way or the other. Either you knew going into this what was going on, you had actual knowledge, or you're a mule who's been seduced into doing this and you've shielded your eyes from the obvious. You can't have it both ways, I don't think. Well, I think you can have evidence that supports either of those theories, and that's what I think we had in this case. You can have evidence that she had actual knowledge. So by actual knowledge, do you mean that when she got in the car in Nogales to drive back to Tucson, she knew exactly what she was carrying? She knew what she was doing, and she was either she had placed it there, somebody else had placed it there, but she knew all about this? Well, there was no direct evidence of that. There was circumstantial evidence from which an inference could be made. And what was the circumstantial evidence that tends to show that she knew at the moment she got into the car before she even sniffed one sniff of the perfume and detergent and so on? Well, the circumstantial evidence was testimony from her Aunt Velia who talked about the fact that when she dropped off the car to lend it to the defendant, she saw the defendant's husband or boyfriend open the trunk, which was empty at the time, and put a baby seat and a diaper bag in the trunk. And at that time, the only thing that was in the trunk was a spare tire. And this was about 3 or 4 in the afternoon, and then her other aunt, Aunt Beatrice, testified the defendant then picked her up at 4 or 5 to take her directly to Tucson. So there was no time in between the moment when the boyfriend opened the trunk and it was empty to the point where the defendant was at the checkpoint that it was out of her control, essentially. From that evidence, the jury could infer that the defendant had that. We have to infer that there was no time that it was out of her control. We don't have a sort of chain of custody of the car, do we? Yeah, we don't have a chain of custody. There's some conflicting evidence here because, as I recall from Carmen's testimony, she testified that Angel was in Tucson because she dropped him off at 7.30 in the morning. He had gone to work. And by the time she's picked up by the Border Patrol and then DEA, she's allowed to call home to verify that he has picked up their oldest daughter from school. So that wouldn't put him in Nogales at all, would it? There is conflicting testimony. All the testimony in this case is confusing, including many inconsistent statements on the defendant's part to the officers. And that's true. But there is, nonetheless, circumstantial evidence. If the jury believes the testimony of the defendant's aunt. I'm sorry. Can you piece it together for me? I am understanding that there's conflicts in the evidence, but we do view the evidence in the light favorable to the verdict. So can you just piece together for me the government's case on actual knowledge, not on deliberate. Sorry. Well, the actual knowledge. What was the government's case on the actual knowledge side that the jury could have accepted? Well, the testimony from the defendant's aunt. He said some of the stuff. The one aunt drops off the car. And she testified that she didn't have anything in the trunk when she delivered the car. She testified that it was empty. It was empty. And then there was testimony that the boyfriend opened the trunk. And whose testimony was that? That was her Aunt Belia, who had loaned the defendant the car. And she, the aunt, said that at the time the boyfriend opened the trunk and put things in there, she, the aunt, was able to sight into the trunk. Yes. And she saw nothing there. That's correct. This was her own car. That's correct. And then. Keep going. I just want to make sure I have this straight in my mind. And then. She hands the keys over. At some point the keys are handed over to the defendant. Before this. And she drives off. That's right. Okay. And then the next. The next thing where she is observed is by the, when she stops at the checkpoint. No, then she goes up and picks her other aunt, who's also in the car. I'm sorry. Who else testified? And then they go straight to Tucson. But in between. When did they pick up her mom? Excuse me? When did they pick up her mother? I believe the mother was dropped off at the house by somebody else before they left Aunt Belia's house. The defendant and her mother leave the house together. That's correct. Then they go pick up the other aunt. As far as I recall. Yes. And then, of course, just the fact that there's 350 pounds of marijuana in the trunk of the car that the defendant's driving. The fact that when she gets stopped at the checkpoint, she does give different stories. First she tells Agent Howells that she's coming from Nogales because she had a sick child in the car, implying that she had to go to the doctor or something to that effect. Then she tells Agent Garcia, I'm not sure how to pronounce that, but at secondary inspection, she says that she had been in Nogales because of a funeral and a death in the family and was staying at her aunt's and that her mother had just called her for a ride to Tucson, and so that's why she was going to Tucson. The funeral trip was actually prior to this. Is that the officer's testimony? Yes. Okay. That's not too far off from her testimony as to the order of all this, that she was in Nogales, Mexico for a funeral, that she had returned to Tucson, gone back to Nogales, Arizona on the shuttle, and was coming back with her mother to Tucson. There's a little bit that's garbled there, but we're really not too far off from her own testimony. That's correct, but I think it's enough that a jury could find that. It is, of course, hearsay that that is what she – we have an officer saying this is what she told me. That's correct. And we have to hope that the officers got the details right because we're faulting her for telling one thing at one time and telling one thing at another time, but they're pretty small, pretty slim details there. Correct. But as far as the evidence of direct knowledge that's about it, there's probably more circumstantial evidence of deliberate ignorance, and there were instructions in this case on knowledge and deliberate ignorance. Before you leave the actual knowledge, I'm looking at the district court's statements as to why a jewel instruction was correct. I'm looking in your supplemental excerpts of record on page 165 where the district court says, the jury might well have concluded that there was actual knowledge that this was a family venture, that the mother and the aunt and the defendant had talked about it, and that the defendant was the best one to drive because she had the young children in the car. Is there anything in the record to support the district court's statement? Well, the entire – It sounds like a great theory for a prosecutor trying to put together a case, but at the end of a trial, is there anything that will support the district court's observations there? Well, the fact that all three individuals in the car, their testimony all conflicted on various points. But if the district court's right there that this was a family venture, then you should have charged the aunt and the mother, which you did not do. No, we didn't. And there may have been. And was there any evidence that they talked about this beforehand? No. And so there's no evidence to support the statement that the defendant was the best one to drive the car because she had the young children in the car. I mean, this is something that we can imagine on our own. Right. But there isn't anything in the record that indicates that there was such a conversation. That's complete conjecture by the district court. Well, other than the fact that they gave inconsistent statements and – Right, but there is no evidence in the record that was – there's nobody who said Carmen should drive because she's got the kids, and when we get there, the Border Patrol won't mess with her because they'll see the kids in the car seat and they'll let us go on to Tucson. That's correct, not that I can think of. Among all the inconsistent statements, that statement's not there. That's correct. Okay. However, all the other things that the district court pointed to were there, and that includes strong statements that this Court has already noted from the defendant herself that essentially stated that she knew marijuana – or suspected marijuana was in the car and didn't want to believe it, which is essentially what deliberate ignorance is. Well, you know, that deliberate ignorance, as we've now formulated it, requires three steps. Number one, she has to suspect that the car contains drugs. I'm just reading out of – I could be reading out of any of several cases, but I'm reading out of Barron. Number one, suspected that the car contained drugs. Number two, deliberately avoided taking steps to confirm or deny those suspicions. And three, did so in order to provide herself with a defense in the event of prosecution. Those last two steps are a little difficult, and I'm not quite sure how I come out on this one. What we have is her testimony, which is to say, it slowly dawned on me, and by the time I actually got stopped – I'm now inferring or maybe paraphrasing a little bit – by the time I actually got stopped, you know, I had some real suspicions, but by the time I actually got stopped, I'd passed the last exit, and, you know, it's one of those things. If this thing had been 20 miles down the road, I might have stopped and said, you know what, I'm out of here, or we're going back, or don't do this to me, Mom. That's kind of her testimony. It doesn't sound as though it's the normal jewel case where the guy picks up a car in Mexico and says, here, for 200 bucks, would you drive this nice new shiny car across the border, and that's all you have to do, just leave the title on the dash when you get out of the car. That's correct. I mean, the timing – I don't think the timing is as important – well, I don't think it's a critical factor here because there are a number of steps that can be taken. There's not just – the instruction doesn't require the defendant not complete the crime and stop and turn around, just that she takes some steps to confirm or deny her suspicion. And in this case, there are a number of steps that could be taken. She could have simply turned to her mother and her aunt and asked what was going on. Were there drugs in the car? She could have pulled off to the side of the road. She could have refused to continue, and the district court noted all these possibilities. And she didn't – there's no evidence that she did any of these things. She didn't check the trunk, which is another thing she could have done, and we do have evidence of that because when she stopped at the checkpoint, she thought that she could open the trunk for officers by pressing a button near the driver's door and open it, and she couldn't, and her key wouldn't work. So she apparently hadn't checked, and she actually testified at one point that she had never checked the trunk. So there is evidence that she didn't take any steps. And how are we supposed to reconcile her inability to open the trunk with the button with the fact that Angel seems to have been able to open that trunk, at least according to Aunt Bealey's testimony? And that's another inconsistency in the record. And, I mean, maybe perhaps that's further evidence of this conspiracy. The district court was talking about among the family because perhaps they made it somehow so that they couldn't open the trunk for the Border Patrol. I don't know. There's nothing in the record as far as we know. Or maybe Aunt Bealey was lying. That's another possibility. Because the district court, and she wants to establish, well, you know, when I dropped it off, boy, it was clean as a whistle. That's correct. But I think the important thing is that the district court carefully listened to the testimony firsthand, carefully took notes, reviewed the transcripts, reviewed the case law, found a variety of facts that supported deliberate ignorance, including, in large part, the defendant's statements, and found that it was, based on all of those factors, it was appropriate in this case. Counsel, is there anything inappropriate in the government presenting inconsistent theories? Is there anything wrong with you coming up before the jury and saying the defendant here conspired with her mother and her sister, they agreed that she would be the driver, and that they would put the kids in the car as a decoy in case they got stopped at the border in order to do this. They've been working on this thing for weeks. They're part of a larger family and a larger chain extending down into Mexico and into the United States. Or in the alternative, Ms. Arradia didn't know a thing about this. She's just an unwitting participant. But at some point, she becomes suspicious. She had a duty to investigate. She didn't investigate. She deliberately avoided this in order to provide a defense for herself, and therefore we get a jewel instruction. Now, can you present both of those at the same time? Is there anything inappropriate with you presenting both of those theories to a jury? Well, assuming there was evidence to support both of those theories? Well, you told us you had evidence. You stood up here and said you had evidence of actual knowledge, and the district judge said yes. But not of this big conspiracy with the family and all the things that you mentioned. I mean, if the evidence, I think, supports these theories, I think the government can say, well, you know, there's evidence of actual knowledge, and if you don't believe it. And evidence of no actual knowledge. And evidence of no conspiracy. But there's, and then if they don't believe. In one of these, you're going to say she knew in advance, and she conspired with her mother and her aunt to do this. And at the same time, jury, if you're not comfortable with that, I've got a different theory for you, which is that she didn't know a thing about this before she got in the car. But halfway between Nogales and Tucson, it dawns on her what's happening. She doesn't take the steps to confirm her suspicions, and she doesn't do so in order to provide herself with a defense. Well, I don't think the evidence supports a conspiracy, because she was in sole, it appears from the testimony, that she was in sole control of the car from the time it was dropped off. The district court seemed to think that there was evidence of a conspiracy. And I think I said that I don't see any evidence in the record that necessarily supports a conspiracy. And the government didn't charge that. But what we did charge, and the jury was instructed on, was not direct knowledge and deliberate ignorance. And I think the jury could, under the ---- Is it your theory that she's just a mule here? Well, if she didn't have direct knowledge, if the jury didn't believe that she had direct knowledge, then they certainly could believe that she was a mule that deliberately ignored the fact that she was involved in drug trafficking. She doesn't fit the pattern for most mules, does she? In what way? Well, most of the mule cases that we have, which a dual instruction is given, we have somebody who is offered money, let's say, to drive a car across the border, drop the keys in the ashtray, and leave it in front of a Kmart, not asking any further questions. And you've got somebody who's got a pretty good idea that he's up to something illegal. He may not know whether it's meth or whether it's heroin or whether it's marijuana in the back, but he knows he's doing something because people don't just pay you to drive a car across the border for $1,000 and have you leave the keys in the ashtray. That's the typical situation which a dual instruction is given. She doesn't really fit that pattern, does she? Well, it's not that exact pattern. However, she is getting a car and driving it, because, as she said, they always have money but have no job to support themselves. Her mother's boyfriend apparently is a drug user. She suspected them of being involved in drugs, and this is who she's driving to Tucson. She knows that they are acting very strangely, drinking and smoking more than usual, very nervous. She notices a strong odor of... Are they drinking in the car? Yes. Notices a strong odor of air freshener or downy, something like that, in the car that's commonly used to mask marijuana. And she doesn't believe her aunt when her aunt explains that, oh, I spilled some detergent in the car earlier. She didn't believe that story. What could she do at that point? She should ask what's going on here. Duty to ask? She goes to jail if she doesn't ask? No. Well, you know, there are a variety of steps that she could have taken, and under these... Ms. Day didn't know the answer to this question. How far is that checkpoint from Nogales? How long was she on I-19? And the record doesn't reflect that. Do you know from your own experience? How far is it between Nogales and Tucson? Well, that's about 45 minutes to an hour, I would say. I mean, it's not on the record. All interstate? Yes. Now, you convicted her not merely of possession and not merely of knowing possession, but you convicted her of possession with intent to distribute. How do you get from she should have asked Mom, is there marijuana in the back, to she had this with her own intent to be herself a distributor, which I think possession with intent to distribute means. Well, I think the intent to distribute is based on the 350 pounds of marijuana that was in the trunk. Well, I understand that. And that there's... But your theory of the case is that, well, her deliberate ignorance was. Your deliberate ignorance theory of the case is it was in the back. She didn't put it there. Mom or somebody else put it there, and she's transporting it knowing that she is transporting it. How do you get from knowing that she's transporting it on behalf of a wicked mother to I'm possessing it with intent to distribute me? Because I think the case law tells us that there's no legal distinction between knowingly possessing and being deliberately ignorant, and there's no... No, I'm talking about the intent to distribute, not just possession, but I'm talking about distribute. But if one's convicted of possession of 350 pounds of marijuana, we would charge that as a possession with intent to distribute based on... Intent is what you charge. And so there's no... How do you get from I didn't ask Mom, what are you doing, wicked Mom, making me transport your marijuana, to a theory that she, this defendant, is trying to distribute it? Well, I think, again, because there's no legal distinction between possession and deliberate ignorance. So it's as if somebody was convicted of possessing 350 pounds of marijuana, which is an obvious distribution amount. Well, I'm not sure that's so obvious. I mean, the charge is not possession of 350 pounds. The charge is possessing it. And with she herself having the intent to distribute, isn't it entirely consistent with your theory of the case that she's the mule and somebody else is going to distribute it once it gets to Tucson? I thought there was an instruction that told the jury that, I don't know if it was in this case, but I thought there was an instruction that is given jurors to tell them if the quantity possessed is over a amount that one would reasonably use, they can infer intent to distribute from that. I don't know if it was given in this case. That's typically given in this type of a case with intent to distribute, although I don't know off the top of my head whether that was in particular given in this case. Does the crime intent to distribute include that I have to be the distributor? I mean, does an ordinary mule get charged with intent to distribute? Yes. It's typical. He's in the chain of distribution. So we always charge it that way. What can we infer back from the jury's conviction of intent to distribute? Must they have found actual knowledge? I mean, there are two ways you could have found her guilty of the crime. One is knowledge. One is deliberate indifference. I'm sorry. I keep saying that, but I don't mean it, and I'm deliberately not knowing. Is the added element, the added finding of the part of the jury that it was with intent to distribute, does that imply or force the inference that they must have found actual knowledge? I don't think it forced the inference. I share what I sense to be Judge Fletcher's problem with saying I didn't know it was there. I didn't know it was there, and I wasn't going to look, and I'm going to sort of blind myself to it, and putting on top of that an inference of, but I'm a distributor. I mean, whatever it is out there, I'm intending to distribute it. The finding of intent to distribute strikes me as more consistent with an actual finding on the part of the jury of actual knowledge rather than. Oh, I would agree with that, that it is more consistent with actual knowledge. Would it force that inference? No. I don't believe so. As Judge Kennedy predicted, this has been nothing but trouble. Every jury case I've ever had has been nothing but trouble. If there's no further questions, I would just ask the Court affirm the defendant's conviction in sentence. Would you like to argue this case in the Supreme Court? Unfortunately, Solicitor General would have to do that. You're not allowed to. But I'd get to. You were asking earlier about. You get one very sympathetic vote, I suspect. I don't know what his view has changed over the years, but I suspect he's still there. You were asking about when my client told the officers that she suspected that there was marijuana. And there is some further evidence that I found in the record where, again, at tab 7, page 26, the Bates page, the bottom of the page. Which page, tab 7, which page? Page 26. 26. The Bates stamp, page 26. Bates stamp, 26, yes. And the witness is DEA Agent Bernie. Which line are you? I'm starting out at 21. Okay. Okay. Basically, the question is, did you ask her, her being appellant, whether she knew there was marijuana in the vehicle? Yes, we did. One of the standard questions is if they have drugs on them. And she said she suspected it. Things seemed suspicious to her. Oops, I can't read my page here. And my partner was actually asking the questions at the time. I believe he asked specifically, did you think it was in there, but you just didn't want to believe it was there? And she said, yes, she had a suspicion. In fact, she also said she didn't feel right about driving the vehicle through the checkpoint, and so she wanted to stop and switch vehicles. She said she planned to switch vehicles, but she never elaborated how she was going to do that. How was she going to switch vehicles? Although we did have testimony that her aunt was driving the blue car on the freeway at the same time. Right. And passed through the checkpoint before they did. Although her aunt denied that. However, I think, you know, what she probably was saying was, I was going to get off the interstate, go home and get a different car and go to Tucson, because things were a little fishy here and she was starting to get nervous about it. Yeah, it's a little hard to tell, partly because we're layering it through the officer's recollection of what she said. Yeah, that's correct. Okay. Thank you. Okay. Next case to be argued is United States v. Saunders. Thank you.
judges: Kozinski, W.fletcher, Bybee